J-S11024-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ARMEL J. BAXTER | |
| Appellant | No. 1277 EDA 2015 |

Appeal from the PCRA Order March 4, 2015
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013121-2007

BEFORE:  FORD ELLIOTT, P.J.E., OTT, J., and MUSMANNO, J.

MEMORANDUM BY OTT, J.:                                **FILED NOVEMBER 17, 2016**

Armel J. Baxter appeals the order entered March 4, 2015, in the Philadelphia County Court of Common Pleas, dismissing his first petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. § 9541 *et seq*. Baxter seeks relief from the judgment of sentence of life imprisonment imposed on February 5, 2009, after a jury found him guilty of first-degree murder, criminal conspiracy, and possession of an instrument of crime ("PIC").[1]  On appeal, he raises multiple ineffective assistance of counsel claims.  For the reasons that follow, we affirm.

_____

[1] 18 Pa.C.S. §§ 2502(a), 903(a)(1), and 907(a), respectively.

The facts underlying Baxter's convictions were recited, as follows, in the decision by this Court affirming his judgment of sentence on direct appeal:

> On April 21, 2007, approximately twenty (20) to fifty (50) people were in the Kenderton Elementary playground. Demond Brown (decedent/victim, also identified on the record as "Demond") had recently finished a game of basketball and was standing on the sideline. The decedent's cousin, Anthony Harris (also identified on the record as "Tony"), and best friend, Hassan Durant, were standing on the basketball court.
>
> [Baxter][1] and Jeffrey McBride[2] were in the backseat of their friend Rachel Marcelis' car, driving to their friend Daryl Mack's (also identified on the record as "Mack") aunt's house. Either, [Baxter] or McBride said they saw someone on the playground and told Rachel Marcelis to go back so they could be sure. Rachel Marcelis drove around the block, and [Baxter] and McBride exited the car.
>
> _____
>
> [1] "[Baxter]" also identified on the record as "Snubbs" and "Jay-Jay[.]"
>
> [2] "McBride", also identified on the record as "Fraddo" and "Fra[.]"
>
> _____
>
> Anthony Harris and Hassan Durant saw [Baxter] and McBride enter the playground with "hoodies"[3] on. People on the playground noticed [Baxter] and McBride because both men were wearing hoodies on a very hot day. The decedent turned around, noticed [Baxter] and McBride, and began to run. [Baxter] and McBride began shooting, and continued to shoot as they walked together side by side. The decedent ran in a "zigzag" pattern toward the 15th Street exit. The decedent stumbled out of the playground and fell in the middle of the street.
>
> _____
>
> [3] A "hoodie" is a long sleeved sweatshirt with a hood.
>
> _____

[Baxter] and McBride ran out of the playground, and headed east on Ontario Street, then south on 15th Street. Rachel Marcelis saw [Baxter] and McBride running in her direction, and let them back in her car. While in the car, Rachel Marcelis heard [Baxter] and McBride talking about how McBride's gun did not work and he could "not get any rounds off". When they arrived at Daryl Mack's aunt's house, Rachel Marcelis asked McBride "if that was the person who shot De-Nyce." McBride answered "Yes". After they left the house, Rachel Marcelis, [Baxter] and McBride drove to Wilkes-Barre for the weekend, but only Rachel Marcelis returned the following Monday.

An arrest warrant was issued for both [Baxter] and McBride on May 4, 2007. McBride was arrested in Wilkes-Barre on May 7, 2007, after police were informed of his outstanding warrant. [Baxter] was found at a motel in Wilkes-Barre on July 10, 2007, after the police received a call regarding a domestic violence issue. [Baxter] was initially arrested for false identification, after he gave officers three false names. He was subsequently arrested [i]n this case after further investigation by law enforcement.

***Commonwealth v. Baxter***, 996 A.2d 535 [437 EDA 2009] (Pa. Super. 2010) (unpublished memorandum at 1-2) (footnote omitted), *quoting* Trial Court Opinion, 7/8/2009, at 2-3 (citations omitted).

Baxter's case proceeded to a jury trial on January 29, 2009.[2] As noted above, on February 5, 2009, the jury convicted him of first-degree murder, criminal conspiracy, and PIC. On that same day, the court sentenced Baxter to life imprisonment, without the possibility of parole, for the murder conviction, with concurrent sentences of ten to 20 years' imprisonment for the conspiracy charge and one to two years' incarceration for the PIC crime.

---

[2] Baxter and McBride were tried together.

On March 3, 2010, we affirmed his judgment of sentence, and the Pennsylvania Supreme Court denied his petition for allowance of appeal on February 23, 2011. *See id.*, *appeal denied*, 17 A.3d 1250 (Pa. 2011).[3]

> On September 23, 2011, Baxter filed a *pro se* PCRA petition.[4]
>
> On November 2, 2012, Gary Server, Esquire[,] was appointed to represent [Baxter]. On September 24, 2013, Mr. Server filed an amended petition, raising various issues [Baxter] identified in his *pro se* filings. On November 13, 2013, [Baxter] filed a motion to proceed *pro se*. On June 9, 2014, after [Baxter] declined to participate in a video conference, he was transported from SCI Coal Township for a *Grazier*[5] hearing. At the conclusion of the hearing, this Court held that [Baxter]'s waiver of counsel was knowing, intelligent, and voluntary, permitted [Baxter] to represent himself, and appointed an investigator to assist him. On October 27, 2014, Craig Cooley, Esquire[,] entered his appearance as counsel for [Baxter].

PCRA Court Opinion, 3/4/5015, at 1-2.

An evidentiary hearing was held on January 20, 2015. The PCRA court limited the hearing to the following issues:

- Trial counsel's ineffectiveness for failure to cross-examine a witness as to her immunity petition; and

- Trial counsel's ineffectiveness for failure to examine Gregory Blackmon, Stefon Studivent, Kyle Carter, Darryl Mack, and Deborah McBride.

_____

[3] Mark Greenberg, Esquire, represented Baxter at trial and on direct appeal. We note McBride also filed a direct appeal, which was docketed at 440 EDA 2009.

[4] Baxter also filed supplemental petitions on March 8, 2012, September 8, 2014, and September 16, 2014.

[5] *Commonwealth v. Grazier*, 713 A.2d 81 (Pa. 1998).

Order, 11/21/2014. On March 4, 2015, the PCRA court entered an order and opinion, dismissing Baxter's petition. This appeal followed.[6]

Baxter raises the following issues on appeal:

1. The PCRA court erred because the record contained sufficient evidence to find Mark Greenb[e]rg made several objectively unreasonable decisions that individually and collectively undermine confidence in Armel Baxter's convictions warranting a new trial. U.S. Const. amends. V, VI, VIII, XIV; Pa. Const. art. §§ 8, 9, 23.[7]

   a. Mark Greenb[e]rg's decision not [to] exercise Armel Baxter's compulsory process right, by not requesting bench warrants for two subpoenaed witnesses – Kyle Carter and Gregory Blackmon – was objectively unreasonable and prejudiced Baxter because Carter and Blackmon were both fact witnesses whose testimony would have undermined Anthony Harris's and Hassan Durant's identifications.

   b. Mark Greenb[e]rg's decision not to subpoena Stephon Studivant and present him at trial was objectively unreasonable and prejudiced Armel Baxter because Studivant was a fact witness whose testimony significantly undermined Anthony Harris's and Hassan Durant's identifications.

   c. Mark Greenb[e]rg's decisions not to present Darryl Mack and to cross-examine Rachel Marcelis with her Cordell Young trial testimony and immunity agreements with the Commonwealth were objectively unreasonable

_____

[6] The court did not order Baxter to file a concise statement of errors complained of on appeal under Pa.R.A.P. 1925(b).

[7] With respect to the first issue, we note Baxter focuses on the legal standard regarding ineffectiveness of counsel and certain duties of counsel, rather than specific incidences of counsel's ineffectiveness. *See* Baxter's Brief at 35-37. Therefore, our analysis will begin with the first sub-issue.

and prejudiced Armel Baxter because they would have individually and cumulatively undermined Marcelis's testimony. The absence of Mack's testimony, Marcelis's testimony at Cordell Young's trial, and her immunity agreements with the Commonwealth undermines confidence in Baxter's convictions warranting a new trial.

    d. Mark Greenb[e]rg's cumulative errors undermine confidence in Armel Baxter's conviction warranting a new trial where Baxter can introduce the exculpatory and impeachment evidence not presented by Greenb[e]rg.

2. Mark Greenb[e]rg violated Armel Baxter's right to counsel by being "totally absent" when the trial court addressed the jury and answered its three questions and by sending an inexperienced attorney who had no criminal defense experience and knew nothing about the case or Baxter's defense. The court should presume prejudice under these circumstances and grant a new trial. U.S. Const. amends. V, VI, VIII, XIV; Pa. Const. art. §§ 8, 9, 23.

Baxter's Brief at 35, 37, 50, 54, 63, and 64 (some capitalization removed).

Our standard and scope of review for the denial of a PCRA petition is well-settled:

[A]n appellate court reviews the PCRA court's findings of fact to determine whether they are supported by the record, and reviews its conclusions of law to determine whether they are free from legal error. The scope of review is limited to the findings of the PCRA court and the evidence of record, viewed in the light most favorable to the prevailing party at the trial level.

*Commonwealth v. Charleston*, 94 A.3d 1012, 1018-1019 (Pa. Super. 2014) (citation omitted), *appeal denied*, 104 A.3d 523 (Pa. 2014).

To be eligible for PCRA relief, [the a]ppellant must prove by a preponderance of the evidence that his conviction or sentence resulted from one or more of the enumerated circumstances found at 42 Pa.C.S. § 9543(a)(2) (listing, *inter alia*, the

ineffective assistance of counsel and the unavailability at the time of trial of exculpatory evidence, which would have changed the outcome of the trial had it been introduced).

*Commonwealth v. Koehler*, 36 A.3d 121, 131-132 (Pa. 2012).

In Baxter's first sub-issue, he contends counsel was ineffective for failing to exercise Baxter's compulsory process right pursuant to the 6th Amendment of the United States Constitution and Article 1, Section 9 of the Pennsylvania Constitution by not requesting that bench warrants be issued for two subpoenaed witnesses, Carter and Blackmon, who did not appear at trial. Baxter's Brief at 37. Baxter argues, "If subpoenaed witnesses fail to appear for whatever the reason, *e.g.*, bad weather, trial counsel must exercise his client's compulsory process rights and request the trial court's assistance by asking it to issue bench warrants to compel and produce these favorable witnesses." *Id.* at 37.[8] Baxter states Greenberg's actions were

_____

[8] He further explains:

Michael Wallace[, co-defendant's counsel,] subpoenaed Carter and Blackmon, and Greenb[e]rg piggybacked off Wallace's subpoena. Carter spoke with Greenb[e]rg the first day he went to court, while Blackmon signed a written statement saying the gunmen were 6'2" or taller. Thus, by subpoenaing both and speaking with Carter at trial, Greenb[e]rg knew or should have known the substance and significance of their testimony and how it undermined Harris's and Durant's identifications. Carter and Blackmon were both at court multiple days waiting to testify on Baxter's behalf. Unfortunately, due to bad weather on February 4, 2009, they incorrectly assumed the courthouse was closed.

*(Footnote Continued Next Page)*

- 7 -

unreasonable based on the following: (1) counsel never made a proffer to the court explaining the substance and significance of Carter's and Blackmon's testimony, which would have undermined the identifications made by Harris and Durant as well as Marcelis' testimony; (2) if counsel had made an on-the-record request and objection after the court denied the request, he would have preserved the issue for appellate review, but by not doing so, he waived the issue; and (3) Baxter suffered great harm because counsel made certain the jury would not hear the relevant and exculpatory testimony of Carter and Blackmon. *Id.* at 39-40. Furthermore, he states:

> To be clear, because Baxter is arguing Greenb[e]rg erred by not raising and preserving this issue for *direct appeal*, the Court's prejudice analysis must focus on how this Court would have adjudicated this issue on direct appeal – *not* post-conviction. The distinction is significant in terms of prejudice. Had Greenb[e]rg properly preserved this issue for direct appeal, all Baxter would have had to demonstrate is that Carter's and

_(Footnote Continued)_ _____

> Wallace requested a continuance to contact Carter and Blackmon, but he [n]ever made a proffer to the trial court explaining the significance of their proposed testimony and how it undermined the Commonwealth's identification evidence, so the trial court denied his request. Greenb[e]rg, on the other hand, as this Court pointed out on direct appeal, never requested a continuance. More importantly, Greenb[e]rg never exercised Baxter's compulsory process rights by requesting the trial court to issue bench warrants for Carter and Blackm[o]n. At the PCRA hearing, Greenb[e]rg and Wallace both said they never requested bench warrants because, if the trial court denied Wallace's continuance request, they assumed it would have denied bench warrant requests.

*Id.* at 39.

Blackmon's proposed testimony was both relevant and favorable to his defense.

*Id.* at 41 (italics in original).

Lastly, with respect to this claim, Baxter asserts the PCRA court made the following errors: (1) it erroneously stated Baxter presented this claim on direct appeal and a panel of this Court determined it was "meritless;" (2) by finding the panel previously adjudicated this claim, the PCRA court misconstrued the substance of his claim and incorrectly analyzed it as a failure to call a witness claim instead of a compulsory process issue; and (3) the court improperly found the testimony of Harris and Durant was credible merely because both men knew Baxter and "the jury 'credited' their testimony." *Id.* at 42.

We begin with the following:

> In evaluating claims of ineffective assistance of counsel, we presume that counsel is effective. ***Commonwealth v. Rollins***, 558 Pa. 532, 738 A.2d 435, 441 (Pa. 1999). To overcome this presumption, Appellant must establish three factors. First, that the underlying claim has arguable merit. ***See Commonwealth v. Travaglia***, 541 Pa. 108, 661 A.2d 352, 356 (Pa. 1995). Second, that counsel had no reasonable basis for his action or inaction. ***Id.*** In determining whether counsel's action was reasonable, we do not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis. ***See Rollins***, 738 A.2d at 441; ***Commonwealth v. (Charles) Pierce***, 515 Pa. 153, 527 A.2d 973, 975 (Pa. 1987). Finally, "Appellant must establish that he has been prejudiced by counsel's ineffectiveness; in order to meet this burden, he must show that 'but for the act or omission in question, the outcome of the proceedings would have been different.'" ***See Rollins***, 738 A.2d at 441 (quoting ***Travaglia***, 661 A.2d at 357). A claim of ineffectiveness may be denied by a

showing that the petitioner's evidence fails to meet any of these prongs. ***Commonwealth v. (Michael) Pierce***, 567 Pa. 186, 786 A.2d 203, 221-22 (Pa. 2001); ***Commonwealth v. Basemore***, 560 Pa. 258, 744 A.2d 717, 738 n.23 (Pa. 2000); ***Commonwealth v. Albrecht***, 554 Pa. 31, 720 A.2d 693, 701 (Pa. 1998) ("If it is clear that Appellant has not demonstrated that counsel's act or omission adversely affected the outcome of the proceedings, the claim may be dismissed on that basis alone and the court need not first determine whether the first and second prongs have been met."). In the context of a PCRA proceeding, Appellant must establish that the ineffective assistance of counsel was of the type "which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt [or] innocence could have taken place." 42 Pa.C.S. § 9543(a)(2)(ii). ***See also (Michael) Pierce***, 786 A.2d at 221-22; ***Commonwealth v. Kimball***, 555 Pa. 299, 724 A.2d 326, 333 (Pa. 1999).

***Commonwealth v. Washington***, 927 A.2d 586, 594 (Pa. 2007).

The Sixth Amendment of the United States Constitution provides, "In all criminal prosecutions, the accused shall enjoy the right ... to have the assistance of counsel for his defence." U.S.Const. amend. VI. Likewise, Article 1, Section 9 of the Pennsylvania Constitution states, "In all criminal prosecutions the accused hath a right to be heard by himself and his counsel ...." Pa.Const. art. I, § 9.

"It is clear that under both our state and federal constitutions, a criminal defendant has a right of compulsory process to obtain witnesses in his favor." ***Commonwealth v. Lahoud***, 339 Pa.Super. 59, 64, 488 A.2d 307, 310 (1985) (*allocatur denied*), quoting ***Commonwealth v. Allen***, 501 Pa. 525, 531, 462 A.2d 624, 627 (1983). "The right to compulsory process encompasses the right to meet the prosecution's case with the aid of witnesses, and the right to elicit the aid of the Commonwealth in securing those witnesses at trial, both of which are fundamental to a fair trial." ***Commonwealth v. Jackson***, 457 Pa. 237, 243, 324 A.2d 350, 354-355 (1974); ***Commonwealth v. Lahoud***,

*supra*. "Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law." **Washington v. Texas**, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019, 1023 (1967). "[The] constitutional right, though fundamental, is not, however, absolute." **Commonwealth v. Jackson, supra** 457 Pa. at 243, 324 A.2d at 355. In order to compel the attendance of a witness at trial, it must be shown that the information possessed by the witness is material, i.e., capable of affecting the outcome of the trial, and that it is favorable to the defense. **United States v. Valenzuela-Bernal**, 458 U.S. 858, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982).

**Commonwealth v. McKenzie**, 581 A.2d 655, 657 (Pa. Super. 1990).

Even though case law is very limited on this subject, in

**Commonwealth v. Twiggs**, 331 A.2d 440 (Pa. 1975), the Pennsylvania

Supreme Court considered a substantially similar issue:

In determining whether counsel's failure to secure the attendance of the witness or to have the notes of his previous testimony read to the jury constituted constitutionally ineffective assistance of counsel, we are guided by the standards established in **Commonwealth ex rel. Washington v. Maroney**, 427 Pa. 599, 235 A.2d 349 (1967). There we held that

"counsel's assistance is deemed constitutionally effective once we are able to conclude that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests. The test is *not* whether other alternatives were more reasonable, employing a hindsight evaluation of the record. Although weigh the alternatives we must, the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis."

**Id.** at 604, 235 A.2d at 352.

- 11 -

> If counsel's decision not to secure [the witness]'s appearance or to have the notes of [the witness]'s previous testimony read to the jury was based on a reassessment of its worth and a conclusion that it was of little or no value in the posture of this case, then that decision clearly had some reasonable basis designed to effectuate [the appellant]'s interests. In such circumstances, counsel's conduct would not constitute ineffectiveness. See **Commonwealth ex rel. Washington v. Maroney**, **supra**. Had counsel reached this decision on a basis designed to advance his client's interest, this case would be analogous to those situations in which, as a matter of trial strategy, counsel decides not to call a witness at all. See **Commonwealth v. Dancer**, 460 Pa. 95, 331 A.2d 435 (1975); **Commonwealth v. Owens**, 454 Pa. 268, 275, 312 A.2d 378, 382 (1973); **Commonwealth v. Karchella**, 449 Pa. 270, 296 A.2d 732 (1972); **Commonwealth v. Ellis**, 445 Pa. 307, 284 A.2d 735 (1971); **Commonwealth v. Hawkins**, 445 Pa. 282, 284 A.2d 730 (1971).
>
> If, however, counsel's failure to seek compulsory process to obtain [the witness]'s testimony or to have his prior testimony read to the jury was the result of sloth or lack of awareness of the available alternatives, then his assistance was ineffective. In a case where virtually the only issue is the credibility of the Commonwealth's witness versus that of the defendant, failure to explore all alternatives available to assure that the jury heard the testimony of a known witness who might be capable of casting a shadow upon the Commonwealth's witness's truthfulness is ineffective assistance of counsel.

**Twiggs**, 331 A.2d at 442-443.

A review of the record reveals the following. Counsel for McBride, Michael Wallace, Esquire, subpoenaed both Carter and Blackmon to testify at both defendants' trial. On February 4, 2009, during the defense's case-in-chief, Wallace asked for a brief continuance to determine which witnesses were there. When he learned Carter and Blackmon were not in the courthouse, he then called them to determine their whereabouts. Wallace

- 12 -

stated Carter and Blackmon had been at the trial, and assured him they would be there. He told the trial court that he assumed their absence was based on the weather conditions. He attempted to ask for a continuance, but the court interrupted him, stating there was no problem with public transportation and there was no line outside the courthouse. Wallace then asked for time to make additional phone calls, which the trial court granted. *See* N.T., 1/20/2015, at 198-204.

At the January 20, 2015, PCRA evidentiary hearing, Wallace testified he did not obtain a bench warrant for the two men based on the following: "[B]ecause the judge immediately said no, we're moving forward, so it would have been a waste of time, because if [the judge] wasn't going to give me an opportunity to go back and try and get them, she wasn't going to give me an opportunity to sit around and wait two days for a bench warrant." *Id.* at 209. Wallace indicated he did object "to the fact that [the judge] told me to go right on. I think the words are in the record, you're taking my client's defense away from me, my defense, whatever I said." *Id.*

Greenberg also testified at the PCRA evidentiary hearing. He indicated he worked jointly with Wallace "to get the witnesses in court" and "coordinated subpoenaing these witnesses." *Id.* at 213, 241-242. Greenberg stated, "The judge allowed me to follow Mr. Wallace's lead when it came to subpoena so we did not have to duplicate the process." *Id.* at 213. Greenberg further testified the defense at trial was mistaken

identification and hypothesized potential concerns with presenting Carter and Blackmon as defense witnesses. *Id.* at 244-245. He noted they were good friends of Baxter's and based on his experience with juries, "if the witness is a good friend, he or she has more of a bias than a total stranger." *Id.* at 245. Additionally, he stated that a witness could be impeached by his or her criminal record but he could not remember if Carter or Blackmon had criminal records. *Id.* Third, Greenberg testified, "[P]eople see different things from different perspectives. Whether or not a hoody would have covered the face of a witness from one perspective doesn't mean it would have covered the face of a witness from a different vantage point." *Id.*

Lastly, Carter and Blackmon both testified at the PCRA hearing. The court summarized their testimony as follows:

> Blackmon testified that he was at the basketball game where the shooting occurred, and that prior to the shooting he saw two tall, slender men in hooded sweatshirts approach the game. He said that he could not see their faces because the hoods obscured them. Blackmon asserted that he would have testified to these facts and that he appeared at trial. However, when asked why he did not testify, he initially explained that one of the attorneys said that he did not need Blackmon to testify. Later, Blackmon contradicted this testimony by stating that he did not appear for court because of the weather.
>
> Carter testified that he, too, was at the basketball game on the day of the shooting, and saw the hooded shooters but did not witness the actual shooting. Carter described the shooters as taller than himself but stated that he could not see their faces because of their hoods. Carter was inconsistent within his testimony regarding where he was located when the shooting began. During his testimony he stated he was in three different locations: just off the basketball court, sitting on a car, and running to get under a car. He was impeached with his affidavit

- 14 -

from October 14, 2013, in which he said he was running at the time of the shooting, which he admitted was wrong. Carter was also inconsistent regarding the reason he did not testify at trial. Carter said that he was present at the trial but did not testify because "[m]y services weren't needed." Carter did not mention anything regarding a snow storm or courts being closed until prompted by the District Attorney, after which he indicated he believed that court was cancelled.

PCRA Court Opinion, 3/4/2015, at 5 (record citations omitted).

With respect to this claim, the PCRA court noted the following:

[2] Carter and Blackmon were subpoenaed by McBride's attorney, Michael Wallace, Esquire. However, it is clear from the record at trial that there was communication and cooperation between Mr. Greenberg and Mr. Wallace with regards to locating witnesses.

[3] This Court notes that [Baxter]'s argument that trial counsel should have made a proffer to the trial court as to the testimony of Blackmon and Carter and pursued bench warrants was found to be meritless by [the] Superior Court. On appeal, [Baxter] argued that the court erred and abused its discretion in denying a continuance to the defense on February 4, 2009 for these witnesses. Although the Superior Court found that the claim was waived, it also found it to be meritless based on the fact that there were no guarantees that the witnesses would have shown up, should the trial have been continued.

*Id.* at 6, 7.

In dismissing the claim, the PCRA court found Baxter had "failed to establish that the witnesses were willing and able to cooperate on behalf of

[Baxter] and that proposed testimony was necessary to avoid prejudice."

*Id.* at 5.[9] Specifically, the court determined:

> [Baxter] has also failed to establish that the proposed testimony of Carter, Blackmon, and Studivant was necessary to avoid prejudice as the testimony does not discredit the persuasive testimony provided at trial by Anthony Harris and Hassan Durant. On the day of the shooting, Durant was at the park when he noticed [Baxter] and McBride. Durant immediately paid attention to [Baxter] and McBride when they arrived at the park because it was a hot day and Durant thought it was odd that they were wearing hoodies. Durant was about twenty feet from the shooters when they shot Brown and "[he] seen [sic] it perfect." Durant identified [Baxter] and McBride at trial and indicated that [he] had seen [Baxter] around the neighborhood for about a year before the shooting. Durant explained that although the shooters had hoods on, he could see their faces.
>
> Harris was also present in the park for the shooting. Harris saw [Baxter] and McBride before they entered the park and they put their hoods up. Harris saw [Baxter] pull out a gun and shoot Brown. Harris identified [Baxter] as the shooter and explained that Harris had known [Baxter] for over twenty years as he lived three doors down from him. Harris explained that even when [Baxter] and McBride had their hoods up, Harris could see their faces.
>
> Harris and Durant's testimony was credited by the jury, and is not rendered vulnerable by the after-the-fact testimony of Carter, Blackmon, and Studivant. Carter, Blackmon, and Studivant stated that they could not see the shooters' faces because of their hoods, a claim that was implausible. The shooting took place during the daytime in front of a crowd; in those conditions, it is not plausible that a hood would completely obscure a person's face. Further, neither Carter, Blackmon, nor Studivant knew [Baxter] prior to the shooting whereas both

---

[9] We note the PCRA court also discusses another witness's, Studivant, testimony in conjunction with its analysis of Carter and Blackmon. Baxter's second argument concerns Studivant. Therefore, for ease of discussion, we have included the court's findings regarding Studivant as well.

- 16 -

Harris and Durant were well acquainted with [Baxter]. Carter, Blackmon, and Studivant's incredible and vague assertion that … the shooters were taller than [Baxter], a man they did not know, would not have swayed the jury to discredit Harris and Durant's testimony that Durant saw his neighborhood acquaintance and Harris saw his neighbor of over twenty years shoot Brown in broad daylight. [Baxter]'s claim that trial counsel was ineffective for failing to present testimony from Carter, Blackmon, and Studivant is meritless.

*Id.* at 7-8 (record citations omitted).

Although we agree with the court's ultimate determination, we do so pursuant to alternative basis.[10] In applying the ineffective assistance of counsel standard, we find there was arguable merit to Baxter's claim. **See Washington**, **supra**. Counsel should have requested a bench warrant, as opposed to a continuance, because Carter and Blackmon were subpoenaed. Moreover, because the witnesses' testimony would have directly contradicted the testimony of the two primary Commonwealth witnesses, there was a factual issue regarding identification that would have been for the jury to resolve.

---

[10] "This Court is not bound by the rationale of the trial court, and we may affirm the trial court on any basis." **Commonwealth v. Williams**, 73 A.3d 609, 617 n.4 (Pa. Super. 2013) (citation omitted), *appeal denied*, 87 A.3d 320 (Pa. 2014).

Here, the PCRA court largely dismissed the claim based on credibility determinations concerning the trial witnesses. In accordance with **Twiggs**, this type of determination would not overcome the ineffectiveness hurdle. **Twiggs**, 331 A.2d at 443. The court incorrectly assumes the jury would find Carter and Blackmon's testimony incredible.

Nevertheless, we are compelled to conclude trial counsel pursued a reasonable trial strategy with respect Carter and Blackmon based on the circumstances of the case. We note Greenberg worked jointly with Wallace and therefore, Wallace's actions with respect to procuring the witnesses should be applied to Greenberg. Wallace subpoenaed Carter and Blackmon. Both men stated they were at trial on the days leading up to the date they were supposed to testify. Therefore, both Greenberg and Wallace would have no reason to believe that the two witnesses would not show up on the designated day. Furthermore, Wallace did ask for time to call the missing witnesses and ascertain their whereabouts. When he attempted to ask for a continuance after failing to find them, the court denied his request. Therefore, both counsels were correct to infer that the court would not grant them even more additional time to procure a bench warrant and that such an attempt would be futile.[11]

Counsel's strategy is further supported by the fact that on direct appeal, a panel of this Court determined the trial court did not abuse its

_____

[11]  It merits mention that Wallace even objected to the court's denial of his request for a continuance, asserting the court denied Baxter's co-defendant a defense. Furthermore, the PCRA court noted: "The bench warrant is not meaningless. The bench warrant could have been issued and each of the potential witnesses could have been held in contempt, but it would not have helped the defense in this case when the [trial] judge said she's not granting a continuance for the witnesses to be located and brought in."  N.T., 1/20/2015, at 256.

discretion in denying the attempted request for a continuance.[12] ***Baxter***, 996 A.2d 535 [437 EDA 2009] (Pa. Super. 2010) (unpublished memorandum at 13). Specifically, the panel opined:

> After a review of the record, it is clear that the trial court did not abuse its discretion in refusing to grant a continuance. Although the weather conditions were poor, court was in session, the weather did not prevent the jury or the other witnesses from appearing, and public transportation was still operational. N.T., 2/4/09, at 24. Also, the potential witnesses did not communicate with [Baxter] or his counsel as to their absence. ***Id.*** [Baxter] hired a private detective to locate one of the witnesses and was unable to locate him. ***Id.*** at 18-19. No information was presented to the trial court that the witnesses would appear if a continuance was granted. As the court had no basis to believe that any further delay would have produced these witnesses, the trial court did not abuse its discretion in refusing to grant a continuance.

***Id.*** at 14-15.

Because the trial court was so decisive in its decision to move the case forward and the panel determined the trial court did not abuse its discretion with regard to this action, we cannot conclude Baxter's counsel was ineffective for failing to also pursue a bench warrant as it would have been considered a non-meritorious or frivolous claim. ***See Commonwealth v.***

---

[12] We acknowledge the panel primarily found Baxter waived the issue because he, himself, did not request a continuance or object to the court's decision not to grant a continuance. ***Baxter***, 996 A.2d 535 [437 EDA 2009] (Pa. Super. 2010) (unpublished memorandum at 13), *citing* ***Commonwealth v. Cannady***, 590 A.2d 356, 362 (Pa. Super. 1991) (holding where the defendant did not object, and he did not join in his co-defendant's objection, the issue was waived as to the defendant for purposes of appeal, even if the objection was identical to claim raised on appeal), *appeal denied*, 600 A.2d 950 (Pa. 1991).

*Fears*, 86 A.3d 795, 803 (Pa. 2014) (holding counsel cannot be deemed ineffective for failing to raise a meritless claim). Furthermore, we cannot find Baxter's counsel failure to seek compulsory process with respect to Carter and Blackmon was "the result of sloth or lack of awareness of the available alternatives[.]" *Twiggs*, 331 A.2d at 443. Accordingly, Baxter failed to satisfy the reasonable trial strategy prong of the ineffective assistance of counsel test. *See Washington*, 927 A.2d at 594. Therefore, we reject Baxter's first sub-claim of PCRA court error.

Next, Baxter argues counsel was ineffective for not subpoenaing Studivant and presenting him at trial. Baxter's Brief at 50. Baxter states:

> Greenb[e]rg knew about Studivant because he wrote him before trial and Studivant spoke with Greenb[e]rg's investigator before trial. Even if Studivant did not speak with Greenb[e]rg's investigator, the record, as the PCRA Court found, "is clear" that Greenb[e]rg knew of [or] should have known about Studivant's testimony because, as the PCRA Court found, "there was communication and cooperation between Mr. Greenb[e]rg and Mr. Wallace with regards to locating witnesses." Thus, despite knowing about Studivant's testimony, as the PCRA Court found, Greenb[e]rg never subpoenaed him.
>
> At the PCRA hearing, Studivant's testimony was consistent with Carter's and Blackmon's regarding the shooting: (1) he could not identify the gunmen because their hoodies were pulled tightly over their heads; (2) the gunmen were approximately 6'1" to 6'2"; and (3) when people returned to the basketball courts several minutes after the shooting to assess the situation, he saw and heard Anthony Harris accuse Malik Ware of being one of the gunmen. These facts, as mentioned, would have been tremendously favorable to Baxter's defense.

*Id.* at 50-51.  Baxter again argues the PCRA court misinterpreted his claim by analyzing it as a failure to call a witness argument as opposed to a compulsory process issue.  *Id.* at 51.

Here, the PCRA court stated the following:  "Studivant was not subpoenaed, however, according to a letter from Mark Shaffer dated December 2008, it is clear that trial counsel made multiple unsuccessful attempts to locate Studivant.  Additionally, Studivant testified that he was aware of [Baxter]'s trial and the need for his testimony."  PCRA Court Opinion, 3/4/2015, at 6 (citations omitted).  The court also found that Studivant did not give credible testimony at the PCRA hearing with regard to why he did not appear at trial.  *Id.*

The record supports the court's finding.  Multiple attempts were made to contact Studivant.  First, on September 3, 2008, Greenberg sent a letter to Studivant, stating: "Mr. Baxter insists that he is innocent and advises that you may have some relevant information about the case.  Please contact me at your earliest convenience so that we can talk about the case in greater detail."  Baxter's Post-Hearing Brief, 2/5/2015, at Exhibit 3.  Approximately three months later, Mark H. Shaffer, the hired private investigator, sent a letter to Greenberg regarding the witnesses he was hired to locate.  With regard to Studivant, Shaffer stated:  "There was no answer at the time of our arrival.  We left a sealed envelope requesting that he telephone us.  He

has not telephoned." *Id.* at Exhibit 5. Subsequently, on January 20, 2009,

Shaffer wrote a second letter to Greenberg, in which he averred:

> No record was found for [Studivant] in our databases. The provided residence address of 3433 N 16th Street, Philadelphia, PA 19140 is deeded to Deborah Willis as of 1999. No criminal record surfaced.
>
> We traveled to the provided residence address but on this occasion residents directed us to go across the street to 3444 N 16th Street where the door was answered by a black female identifying herself only under the first name of Josephine and as the grandmother of Stefon [Studivant].
>
> She states that Stefon [Studivant] is away at college, does not live at home and has a cell phone. She refused to give us his cell number or the house number. She refused to provide us with his college address but did advise he is presently a student at Lincoln University, Oxford, PA.
>
> We gave Josephine the letter we had prepared in advance and related the urgency of Stefon [Studivant] telephoning us. She stated that she would only promise to pass the letter onto Stefon [Studivant]'s mother.
>
> We have not received a call.

*Id.* at Exhibit 6, pg. 2.

At the January 20, 2015, hearing, Studivant testified Greenberg and

Shaffer never contacted him directly or subpoenaed him. N.T., 1/20/2015,

at 82. He also stated he came to the courthouse for one day of Baxter's trial

but could not remember which day it was. *Id.* at 86.

Again, Baxter has failed to establish Greenberg's failure to seek

compulsory process with regard to Studivant was "the result of sloth or lack

of awareness of the available alternatives[.]  *Twiggs*, 331 A.2d at 443.

- 22 -

Multiple attempts were made to ascertain Studivant's whereabouts but none were successful. Studivant even admitted he was at the trial but did not indicate he went up to Baxter or Greenberg to indicate his willingness to testify. The evidence surrounding Studivant demonstrated he was not prepared to cooperate with Baxter's defense. As such, we agree with the PCRA court that Studivant's testimony as a willing witness was incredible. *See Commonwealth v. Pate*, 617 A.2d 754, 760 (Pa. Super. 1992) (noting credibility of witnesses in PCRA proceedings is exclusively within the province of the trial court). Accordingly, Baxter's second ineffectiveness sub-claim fails.

Baxter's third sub-issue involves counsel's failure to effectively undermine the testimony of Rachel Marcelis. By way of background, Marcelis testified she was driving the two co-defendants to Daryl Mack's aunt's house when they made her stop at the schoolyard/playground and drop them off. She said she subsequently saw them running in her direction, and let them back in the car. She heard the two men discuss how McBride's gun did not work and he could not fire any rounds. She asked McBride "if that was the person[, the victim,] who shot De-Nyce" and he answered in the affirmative. *Baxter*, 996 A.2d 535 [437 EDA 2009] (Pa. Super. 2010) (unpublished memorandum at 2). Marcelis testified she drove the two men to Mack's aunt's house and then to Wilkes-Barre, Pennsylvania. Baxter states counsel was ineffective for not cross-examining Marcelis

regarding her trial testimony from an unrelated case (the Cordell Young trial[13]), and her immunity agreements with the Commonwealth. *See* Baxter's Brief at 54. He also contends counsel failed to present Mack as an impeachment witness with respect to Marcelis. *Id.* Mack would have purportedly testified that he was at a party with Marcelis on the night before the shooting took place, and observed her consuming numerous amounts drugs and alcohol. N.T., 1/20/2015, at 19-20. He stated he did not see Baxter at this party. The following morning, he saw Marcelis driving her vehicle with no passengers. *Id.* at 22. He asked her for a ride and she told him that he could drive her car because he had a license. *Id.* at 24. He then drove to a paramour's house and visited for approximately two hours while Marcelis fell asleep in the vehicle. *Id.* at 25-26. Afterwards, he was driving back to his neighborhood when he received a phone call about the shooting. *Id.* at 27-28. Mack was not interviewed by investigators but did speak with Wallace at the courthouse. *Id.* at 28-32. Consequently, Baxter complains Greenberg failed to "present readily available witness testimony and evidence capable of undermining Marcelis's credibility." Baxter's Brief at 54.

---

[13] Baxter alleges detectives "coaxed Marcelis to falsely implicate" Young in connection with the murder of a woman named Fatima Whitfield to protect her own interests. Baxter's Brief at 56. Baxter does not provide any background information regarding this non-related case. He does not recite the statement or point to any part of it, which he claims is false.

First, Baxter states Greenberg never specifically spoke with Mack, but rather relied on Wallace's conversation with Mack to make the decision not to call him. *Id.* at 55. Second, he asserts Greenberg did not adequately interview Marcelis to obtain and review her allegedly fabricated May 3, 2007, statement in the Cordell Young trial.[14] Baxter also claims Mack's purported testimony contradicts Marcelis's narrative of the events unfolding in relation to the present case. He argues:

> A competent trial attorney could have persuasively argued detectives chose not to interview Mack because they coerced Marcelis's May 3, 2007 statement and did not want to interview a witness who could expose their coercion.
>
> …
>
> Competent trial counsel could have also persuasively argued detectives chose not to interview Mack because they knew the eyewitness statements did not corroborate Marcelis's narrative that, after the shooting, Baxter and McBride supposedly ran toward her SUV with a group of scared onlookers from the basketball courts. To hammer this point home, competent trial counsel would have highlighted the fact the Commonwealth did not present one witness who said they saw a white SUV near the basketball courts immediately before or after the shooting or who saw the gunmen jump into a white SUV immediately after the shooting.

_____

[14] A cursory review of the record reveals that this 2007 statement was not included in the certified record. We note that it was mentioned in Baxter's post-hearing brief as Exhibit 2, but was not attached to the corresponding brief. *See* Baxter's Post-Hearing Brief at 4 n. 2. "It is the responsibility of an appellant to ensure that the record certified on appeal is complete in the sense that it contains all of the materials necessary for the reviewing court to perform its duty." *Commonwealth v. Bongiorno*, 905 A.2d 998, 1000 (Pa. Super. 2006) (*en banc*), *appeal denied*, 917 A.2d 844 (Pa. 2007).

*Id.* at 56-57.  Third, Baxter maintains Greenberg should have impeached

Marcelis by introducing her immunity agreements with the Commonwealth in

the present matter and in the Cordell Young case.  *Id.* at 57.  Further, he

states:

> Despite having the opportunity to tell the whole truth, without
> fearing prosecution, Marcelis's testimony at both trials cannot
> possibly be true.  Her testimony at Cordell Young's trial differed
> from her testimony at Baxter's trial because, at Young's trial, she
> said she fabricated her May 3, 2007 statement, but at Baxter's
> trial she said her statement was true.

*Id.*  Baxter suggests that "all Greenb[e]rg did was cross-examine Marcelis

and get her to admit she occasionally heard voices when she did drugs" and

this testimony "did little, if anything, to the Commonwealth's overall

narrative."  *Id.* at 58.  Baxter also claims Marcelis's marred testimony and

credibility would have called into question Harris's and Durant's

identifications.  *Id.* at 59.

To the extent Baxter argues counsel was ineffective for not cross-

examining Marcelis regarding her testimony at the Cordell Young trial, or her

allegedly contradictory statements at both trials, and for failing to put Mack

on the stand to demonstrate that detectives chose not to interview him

because they coerced Marcelis's May 3, 2007 statement, we find these

arguments waived for failure to properly preserve the issue.  A review of the

record reveals these claims were not contained in Baxter's amended PCRA

petition or addressed at the January 2015 PCRA hearing.  It merits mention

again that the PCRA court limited the hearing to two claims, neither of which

- 26 -

touched upon these arguments. Further, at the end of the hearing, the court provided the parties with two weeks to file submissions. Counsel for Baxter stated, "I know [Baxter] has done a tremendous amount of pleadings already. I think you know the case very well. I'll just highlight what's here and the case law." N.T., 1/20/2015, at 295. Nevertheless, Baxter did raise these new assertions in his post-hearing brief. *See* Baxter's Post-Hearing Brief, 2/5/2015. However, because they were not included in the petition or raised at the PCRA hearing, these arguments were not properly before the PCRA court.[15] *See* Pa.R.A.P. 302(a) ("[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Accordingly, we conclude these contentions are waived. ***See Commonwealth v. Wharton***, 811 A.2d 978, 986 (Pa. 2002) (waiving claim where appellant failed to raise it in PCRA petition).

We now turn to the remainder of Baxter's argument that was properly preserved for appeal. With respect to his claim that counsel was ineffective for failing to call Mack as a witness, we are guided by the following:

> When raising a claim of ineffectiveness for the failure to call a potential witness, a petitioner satisfies the performance and prejudice requirements of the [***Strickland v. Washington***, 466 U.S. 668 (1984)] test by establishing that: (1) the witness existed; (2) the witness was available to testify for the defense; (3) counsel knew of, or should have known of, the existence of the witness; (4) the witness was willing to testify for the

---

[15] This is evidenced by the fact that the PCRA court did not address these claims in its Rule 1925(a) opinion.

defense; and (5) the absence of the testimony of the witness was so prejudicial as to have denied the defendant a fair trial *Commonwealth v. Johnson*, 600 Pa. 329, 966 A.2d 523, 536 (Pa. 2009); *Commonwealth v. Clark*, 599 Pa. 204, 961 A.2d 80, 90 (Pa. 2008).  To demonstrate *Strickland* prejudice, a petitioner "must show how the uncalled witnesses' testimony would have been beneficial under the circumstances of the case."  *Commonwealth v. Gibson*, 597 Pa. 402, 951 A.2d 1110, 1134 (Pa. 2008).  Thus, counsel will not be found ineffective for failing to call a witness unless the petitioner can show that the witness's testimony would have been helpful to the defense. *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1319 (Pa. 1996).  "A failure to call a witness is not *per se* ineffective assistance of counsel for such decision usually involves matters of trial strategy." *Id.*

*Commonwealth v. Sneed*, 45 A.3d 1096, 1108-1109 (Pa. 2012).

Moreover,

"[t]he inquiry of whether trial counsel failed to investigate and present mitigating evidence turns upon various factors, including the reasonableness of counsel's investigation, the mitigation evidence that was actually presented, and the mitigation evidence that could have been presented." *Commonwealth v. Simpson*, 620 Pa. 60, 66 A.3d 253, 277 (Pa. 2013) (citation omitted).  The reasonable basis prong of an ineffectiveness claim does "'not question whether there were other more logical courses of action which counsel could have pursued; rather, we must examine whether counsel's decisions had any reasonable basis.'"  [*Commonwealth v. Chmiel*, 30 A.3d 1111, 1127 (Pa. 2011)] (citation omitted).

*Commonwealth v. Treiber*, 121 A.3d 435, 471 (Pa. 2015).

Here, the PCRA court found the following:

[Baxter] argues that trial counsel was ineffective for failing to present testimony from Darryl Mack.  Mack testified that on the night before the shooting, he attended a party at the home of a man named Antoine.  At that party, he saw Rachel Marcelis consume large amounts of alcohol, smoke PCP and marijuana, and take pills.  He left the party, but saw Marcelis again the next morning; to him, she appeared to be inebriated.  He asked for a

ride, and she suggested that he drive her white truck while she rode along. He drove to the Frankford section of Philadelphia, in order to visit a woman he was seeing. He visited this woman for approximately two hours and fifteen minutes, and when he returned to Marcelis's truck, she was sleeping where he had left her in the passenger seat. Mack also testified that he showed up to testify at [Baxter]'s trial, but was told by co-defendant's counsel that he should leave because his testimony would be unhelpful.

At trial, Mr. Wallace, indicated that he decided not to call Mack as a witness as his testimony was not helpful. This Court cannot help but conclude that both Mr. Wallace and trial counsel exercised good judgment in refraining from offering Mack's testimony, which failed to contradict Marcelis's testimony and was redundant.[4] Marcelis freely acknowledged at trial that she used Xanax, wet, marijuana, and alcohol on the night before the shooting, that she did so to an extreme degree, and that the substances were still affecting her on the day of the shooting. Mack's testimony regarding Marcelis's drug use was cumulative. Also, Mack's testimony did not undermine Marcelis's testimony that she was with [Baxter] and McBride during the shooting. Mack merely testified that he drove Marcelis's car to his girlfriend's house, left Marcelis in the car, and two hours later when he returned, she was in the car. Mack was driving Marcelis and her car back to Broad Street and Allegheny Avenue when a friend called Mack and informed him of Brown's murder. Nothing in Mack's testimony precludes the possibility that Marcelis drove [Baxter] and McBride to the shooting. Additionally, to the extent that Mack denies being present in the car with Marcelis, McBride, and [Baxter] at the time of the shooting, this Court finds this testimony incredible. Trial counsel was not ineffective for failing to present testimony from Mack.

---

[4] Again, this Court notes that there was communication and cooperation between Mr. Greenberg and Mr. Wallace. Although the record states that Mr. Wallace told Mack to leave, Mr. Wallace stated this fact in front of Mr. Greenberg and [Baxter]. It is clear that Mr. Greenberg was aware of the fact that Mack had been told to leave and agreed with this decision.

---

…

Finally, [Baxter] argues that trial counsel was ineffective for failing to cross-examine Marcelis on the basis that she had entered into an immunity agreement with the Commonwealth in exchange for her testimony. At this Court's hearing in this matter, Mr. Greenberg testified that he chose not to cross-examine Marcelis as to the immunity agreement because he felt that it might actually bolster her credibility with the jury, both by further establishing the likelihood that she had been the getaway driver in this shooting, and by allowing the Commonwealth to point out that the immunity agreement required that she tell the truth at trial, and exposed her to criminal liability if she failed to do so. Because he had already gotten Marcelis to acknowledge her significant drug use during the time period in question, he felt that he had already called her reliability as a witness into question, and thus using the agreement would not offer much and might, in fact, backfire.

Mr. Greenberg expressed a reasonable trial strategy, with a sound basis designed to effectuate the petitioner's interests at trial. "Generally, where matters of strategy and tactics are concerned, counsel's assistance is deemed constitutionally effective if he chose a particular course that had some reasonable basis designed to effectuate his client's interests." *Commonwealth v. Puksar*, 597 Pa. 240, 256-57, 951 A.2d 267, 277 (2008)(quoting *Commonwealth v. Miller*, 572 Pa. 623, 819 A.2d 504, 517 (2002)). "A chosen strategy will not be found to have lacked a reasonable basis unless it is proven 'that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.'" *Commonwealth v. Williams*, 587 Pa. 304, 899 A.2d 1060, 1064 (2006)(quoting *Commonwealth v. Howard*, 553 Pa. 266, 719 A.2d 233, 237 (1998)). This Court agrees that cross-examining Marcelis as to the immunity agreement would have had, at best, greatly diminished returns given what had already been accomplished, and may have had the effect of bolstering her credibility to [Baxter]'s detriment. Further, this Court notes that the jury was aware that Marcelis was never charged with crimes resulting from the murder. Because trial counsel pursued a reasonable trial strategy, this claim must fail.

PCRA Court Opinion, 3/4/2015, 8-9, 11-12 (record citations omitted).

Based on our review, we agree with the PCRA court's well-reasoned analysis that no relief is due on this claim. First, we note the PCRA court explicitly found Mack's testimony incredible. "[S]uch credibility findings, if supported by the record, are binding on this Court." *Treiber*, 121 A.3d at 471 (citations omitted). Second, with respect to Mack, Baxter would like us to reweigh the evidence in his favor, which we may not do. Furthermore, Mack could not account for two hours of Marcelis's time as well as the whereabouts of Baxter and McBride during the shooting. Therefore, the absence of his testimony was not so prejudicial as to have denied Baxter a fair trial. *See Treiber*, *supra*. Lastly, with respect to Baxter's contention regarding evidence of Marcelis's immunity agreement, we emphasize that the question is not whether there were more logical courses of action but whether counsel's decision had any reasonable basis. *See id.* Indeed, the following exchange occurred between Greenberg and Baxter's PCRA counsel regarding the issue:

> [PCRA Counsel]: So you saw harm, you say you saw harm in bringing up the immunity agreement?
>
> [Greenberg]: Yes. Well, I didn't see a whole lot of good, but I think it could hurt him. The DA, for example, in redirect can emphasize the fact that the immunity agreement obligates her to tell the truth and I've been in cases – I've been in a million cases where DAs use plea agreements and immunity agreements to emphasize that the witness is obligated to tell the truth, otherwise the witness is going to be prosecuted for perjury, and I don't want that to corroborate the witness' testimony or credibility.

[PCRA Counsel]: You think it's impactful to the jury that somebody has to be instructed to tell the truth? That wouldn't have any impact on the jury's assessment of her credibility? The Commonwealth is giving the document informing you you must tell the truth, why? Aren't you going to tell the truth anyway?

[Greenberg]: Because there are consequences to not telling the truth and I have found that plea agreements and immunity agreements that are used that require the witness to tell the truth adds to the seriousness of the witness' demeanor and state of mind when he or she testifies. So the answer is yes, it can come back to hurt the defendant

…

[Marcelis's] lawyer was smart enough to protect his client from any murder prosecution by getting a broad immunity agreement. That's the reason why she got the agreement, that was to protect her. But when I'm representing Mr. Baxter and I have a choice of whether or not to use that agreement, I have to evaluate what the purpose of the agreement is, where it is in the context of the facts of the case, and what can be done by the prosecutor on redirect examination to hammer home to the jury that this witness was obligated to tell the truth and that as a result she's going to be that much more careful in recollecting things correctly and truthfully.

[PCRA Counsel]: Or could a trier of fact say, well, she's locked into this set of facts, if she goes outside of this set of facts that the prosecution wants her to testify to, she will get charged with perjury, therefore she's simply following marching orders? Could a trier of fact reasonably make the inference that, you know what, she's just following marching orders?

[Greenberg]. Of course.

[PCRA Counsel]: And would that benefit Mr. Baxter?

…

[Greenberg]: The answer is yes, but understand here that usually in that context the prosecutor brings that up on direct examination and then the defendant goes to town about the significance of the immunity agreement and locking a witness in.

> In our case the prosecutor did not, so if I had brought it up on cross-examination or Mike Wallace had brought it up on cross-examination, that would have given the prosecutor the last word on redirect to elicit facts about that plea agreement that were basically favorable to him and would have hurt Mr. Baxter.

N.T., 1/20/2015, at 231-232, 234-235. The PCRA court found, and we agree, that Greenberg had acted reasonably by not introducing evidence regarding Marcelis's immunity agreement. *See* PCRA Court Opinion, 3/4/2015, at 11-12. Accordingly, Baxter's third sub-claim fails.

With regard to Baxter's remaining two claims, we will address them together. In his fourth sub-issue, Baxter asserts Greenberg's cumulative errors warranted a new trial so that Baxter could introduce exculpatory and impeachment evidence not presented by Greenberg. Baxter's Brief at 63. In Baxter's final claim, he alleges Greenberg violated his right to counsel by being "totally absent" when the trial court addressed the jury and answered its three questions and by sending in his place an inexperienced attorney who had no criminal defense experience and knew nothing about the case or Baxter's defense. *Id.* at 64.

We find both claims were not properly preserved with the PCRA court. *See* Pa.R.A.P. 302(a); *see also Wharton*, *supra*. Baxter did not raise either issue in his PCRA petition or at the PCRA evidentiary hearing. Rather, he raised the fourth sub-issue in his post-hearing brief and the last argument for the first time on appeal. Accordingly, both claims are waived and we need not address them further.

Based on our disposition, we affirm the order of the PCRA court denying Baxter relief.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/17/2016